Next case is Perr-Arsleff, A.S. versus the United States. Next case is A.S. versus the United States.  Before we get started on this case, the parties have divided up their argument time. Each side has 15 minutes, and you've divided up your time into segments of those 15 minutes. I want to make sure that I have this down correct, especially given the cross appeal that's involved in the case. Normally, in a way, we kind of discourage that these type of arguments be divided amongst so many parties. It's your choice, but it's easier for us to follow the arguments if we don't have so many actors involved. But, again, it's your choice. Let me make sure I got this correct. Mr. Rell, you're going to speak first, and you have eight minutes, and you're reserving three for rebuttal. That's correct, Your Honor. Okay. Mr. Connelly, you're going to speak for three minutes, and you reserve one minute for rebuttal. That's correct, Your Honor. Mr. Anstett, you have four minutes, and you're reserving three for the cross appeal. Yes, Your Honor. Mr. Cosgrove, you have six minutes. You're reserving two for the cross appeal. That's correct, Your Honor. And, Mr. Boland, I guess that's 10, 12. That leaves you with three minutes. Your Honor, I believe it was 15 minutes just for it. No, each side has 15 minutes. Okay. So, if this is correct, Mr. Cosgrove has reserved six and four. That's 10. That's going to leave you with five at most, but you've got a cross appeal involved here, too. Your Honor, I represent Peralta. We did not cross appeal. We're the sole appellant. Okay. Well, I guess you all should have gotten together on this. Now, you can't have all 15 minutes for arguing. I mean, you're going to have to divide this up. The other parties are asking for six minutes and four minutes, and I guess two and three for the cross appeal. Is that correct? I think, Your Honor, if you add up my time with Mr. Cosgrove's time, that would be 15 minutes total. You all are looking for 15 minutes, and Mr. Boland is looking for 15. That's 30. I'm not going to allow that. Okay. As you see, we want the parties to have the day in court. We often let people run over time, and if the questions take you over time, then that's fine. But you're going to have to let me know how you want to handle this. You've got 15 minutes. Given the circumstances, I'll give you 20 for your side, and I'll give the other side 20 minutes as well if they need it. Does that sound fair enough? Then you all decide, and let me know so that Mr. Cosgrove, you're going to speak first. Is that correct? I was planning on speaking first, Your Honor. Okay. When you get up here, then you tell me how you're going to handle the time. Yes, Your Honor. Okay. Thank you much. Mr. Connolly, Mr. Rayl, you may proceed. Thank you, Your Honor. May it please the Court. One of the fundamental tenets of federal procurement law is that agencies have to evaluate offers solely in accordance with the criteria in the solicitation. That's exactly what the Air Force did in finding Excellus eligible for award in this case. The GAO, an expert in federal procurement law, recognized this, but the trial court improperly changed the rules of the competition post-award by excising words from the eligibility criteria to find Excellus ineligible in this case. Now, Excellus was eligible under the plain language of the solicitation, which should have ended the court's inquiry into the eligibility evaluation. Instead, relying on extrinsic evidence, and even extra record evidence in this case, the trial court rewrote the eligibility criteria by explicitly excising the words registered as. I understand your argument about the administrative record, and I mean, we have a lot of precedent on that, but it seems that the trial court here was faced with a pretty unusual situation in that one of the solicitation requirements, and it's a negative requirement, which further complicates things, I think, is kind of a null set. And so it didn't apply to anybody. And so what is the trial court supposed to do when that language is, I'm not going to necessarily call it a mistake, because I'm not sure it was a mistake, but at least I'm part of the Air Force, but it's a null set. Should he have just ignored it altogether? Well, ultimately, Your Honor, the facts as they actually exist demonstrate that, yes, that particular provision could not, the registered as a subsidiary foreign company could not actually exclude anyone. But the assumption upon which that was based, which is actually in the solicitation itself, was that a subsidiary foreign company is a type of registered company in Denmark. So the provision was not intended to be meaningless. That's one way of looking at it. Maybe the other way of looking at it is that the intent was aimed at ownership, whether a company is a subsidiary of a foreign company or not, and registration has nothing to do with it. But the language of the solicitation explicitly excluded companies that were registered as a subsidiary foreign company. So registration was an important part of that requirement. That language has to be viewed as a whole, registered as a subsidiary foreign company. We can't exclude registered as. We can't exclude subsidiary foreign company from that language. Why would registration trump ownership here under these circumstances? Well, because we don't, and that's one of the assumptions I believe in particular Parsliff made in its brief, was that necessarily had the CVR, the Danish business registry, operated the way that the Air Force thought it would, Excel would have necessarily been ineligible. And that doesn't have to be the case. It could have very well been that you're only required to register as a subsidiary foreign company if you want to do business in Denmark, if you are an actual foreign company coming in to do business. Excel is registered as a fully registered Danish company, an Aksja Selskab, or an AS. And so they were not required to register as a subsidiary foreign company, which, of course, we ultimately found out didn't exist. They weren't required to register as a branch of a foreign company, which is. It seems to me that the registration requirement is imposed in order to identify whether you have a wholly owned subsidiary or a foreign owned subsidiary. But that's not what the record demonstrates in this case. The solicitation explicitly said that the intent of this language was to determine whether or not a company was fully registered as Danish. Excel is, in fact, fully registered as Danish. They are an AS. And if you look back to the extent we get into extrinsic evidence, which, of course, is our position, we shouldn't. But if you look at Section 1F, I believe, of our reply brief, we go through about how this was about registration throughout the process once the actual language was conceived. You even have the Danish Ministry of Foreign Affairs in July 2014 when the Air Force came to them and said, can you help us to ensure that these companies are, in fact, confirmed that these are, in fact, Danish firms and not subsidiaries of foreign companies. The Ministry of Foreign Affairs came back and said, no, we're not going to do that. This is the Air Force's call, and it's based upon two requirements related to registering in the Danish, Greenlandic, or Faroese business registry and providing a bank letter. So registration was a very important part of this eligibility criteria here, and that was who was excluded was a registered subsidiary foreign company, just as if the language had said you can't be registered as a limited liability company. That's a specific type of company that companies might register as in the United States. And here the Air Force thought there was a ---- trial court judges and your friends on the other side's part that foreign subsidiaries weren't eligible for this contract. Is there anything in the record that suggests that? A company that was registered as a subsidiary foreign company would not have been eligible for this contract. Right. That's not what I'm asking, though, because I think they want to go beyond that and say, you know, everybody understood that a foreign subsidiary couldn't be eligible for this contract. Is there anything in the solicitation that would suggest that that's not necessarily true? No, Your Honor. The solicitation eligibility ---- If the Air Force had wanted to make foreign subsidiaries eligible and put it in the solicitation, could they have done that? Yes. It may have, in some people's views, violated international agreements, right? Right. But that's not what we're talking about here. We're talking about the terms of the solicitation. Yes, Your Honor. That's right. That's what this case is about, is that the Air Force was required to apply the terms of the solicitation as written. And that's exactly what they did. Excellus was not registered as a subsidiary foreign company. In fact, if the Air Force had ignored international trade agreements and said, we're only making this open to American companies, there would have been all kinds of held arrays and diplomacy channels. But the Air Force has to judge the solicitation on its terms. Exactly, Your Honor. Yes. That's correct. So we're looking at the national treatment trade obligation and the most favored nation trade obligation as at play here. But it's a case that if you're registered as a Danish company but you're wholly owned, 100 percent foreign owned, could you participate in the bid process? Yes. That's what the solicitation language did not exclude companies that were fully registered as a Danish company. No, no. Okay. It only had two requirements. You couldn't be one thing. And you had to have a letter from a bank. Right. You had to have the corporate certificate showing that you were registered as a business in Denmark. And the caveat to that was registered office in Denmark and shall not be registered as a subsidiary foreign company. Right. And the bank letter, of course. And Excellus met those requirements. They were not registered as a subsidiary foreign company in Denmark. And that was what the Air Force was bound to follow here, notwithstanding any defect in the solicitation. And that's, I mean, the blue and gold case. You admit that there was a defect in the solicitation. In the sense that the Air Force provided inaccurate information in stating that registration as a subsidiary foreign company was a possibility. Was that a latent defect? There was a patent defect. A patent defect? Right. And that was another error of the trial court that we've raised in this case, is that because it was a patent defect, the plaintiffs waived any ability to challenge that post-award after the close of the bidding process. Why would there be a patent defect and not a latent defect if the Air Force didn't realize itself that the defect existed? Well, the test here is what a reasonable contractor would know. A reasonable Danish company? They're all Danish companies. Yes, exactly. Yes. And we can look to that specifically, I think, as well. Which is to say they're all American companies pretending to be Danish companies. Well, all of the plaintiffs and Excellus are, in fact, Danish companies. With different ownership structures that tie them to American companies in one way or another. Or subcontracting and the like. Never mind. But, yes, the solicitation did state that registration as a subsidiary foreign company was a possibility. What the solicitation did not state was who was required to register as a subsidiary foreign company in Denmark. That was something that offerors needed to find out. And there was a question about this, right? I mean, this isn't something that passed under the radar that nobody even thought of was an issue. Somebody posed a question that's part of the administrative record, and you answered it. Your answer was wrong, but everybody was on notice that this was an issue. Right. Yes. Right. The answer did say that there is a type of registered company called subsidiary foreign company, but it did not say who. Presumably all the companies that were submitting bids would have gone to the registry to check that they weren't registered as a foreign subsidiary. Yes, presumably. And probably would have needed to find out exactly who is required to register as a subsidiary foreign company to make sure that they're not or to know who their competition could potentially be, something that our Slip and Greenland contractors found to be important. And, of course, Copenhagen Arctic, being a newly formed company, needed to know what do we do to not be registered as a subsidiary foreign company so we can compete here. So, yes, this was something that the offerors at least should have been aware of, that there was not, in fact, a way to register as a subsidiary foreign company. In this case, this was a patent error. Can I ask you this? I mean, assuming we disagree with you and we uphold the injunction, and this goes back, are you going to be required to resolicit this under a new term? Or are you just going to reevaluate based upon what the trial judge rewrote as the correct solicitation? And maybe I should add, frankly, I should probably save this for your friend because he may have some objections. But it seems to me that if you go forth under the rewritten solicitation as done by the trial court judge, then your friend is going to be prejudiced because they might have been able to restructure their business relationship in a way to qualify. No, you're right. And we don't agree with this, but the trial court found that the error was deregistered as language and excised that. I think the agency has a number of different things in its discretion it could do. One would be eliminate Excellus based on the fact that they are a subsidiary of a United States company based on the… It seems likely if you do that that you're going to at least be back in the trial court with a bid protest from them because they were saying they were not on notice that that was a requirement in the solicitation because it wasn't until it was put in by the trial court. Right. And what they could perhaps say is we should have the opportunity to correct that since it's a problem there. Yes. And they also… So, I mean, that's one option as well. I think we could potentially award to Per-Arsliff or could go back and amend the solicitation. The agency has broad discretion here in what corrective action it should take. But you've highlighted the problem with what the trial court did here is it changed the eligibility criteria. The agency was required to evaluate based on the criteria actually in the solicitation, and that's what it did. So, yes, I can see how Excellus would have a problem if they were all of a sudden eliminated based on what is essentially a new eligibility criteria that the trial court created. Now, just briefly, if the court were to actually affirm the decisions that the trial court made with regard to the alleged errors, the court should still reverse the judgments in favor of Copenhagen Arctic and Greenland contractors because they weren't prejudiced in that case. I don't really understand what's at issue there. Is that just bid prep cost? Are they seeking bid prep costs? Because I didn't see in the trial court's order that there is any discussion of that or the like. Because if all that we're affirming is the injunction, then it really doesn't matter. The injunction applies. Well, the trial court did grant judgment in favor of three plaintiffs. He did not award bid prep costs to any plaintiffs. But nonetheless, even if the court were to affirm the injunction, it should still reverse the judgments in favor of Copenhagen Arctic and Greenland contractors. Are they still free to seek bid prep costs? Is that your problem there? I don't think so at this point. I mean, they could potentially seek costs, or they actually have already sought costs, and they could potentially seek either. So it's about the costs of the trial court, not the bid prep costs? As a practical matter, that could be an issue. But, I mean, the court should not have entered judgment in favor of those two plaintiffs, even based on the errors it found, because they were the third and fourth lowest price offers, and Per Arslev was second in line, and basically what the trial court found was that Excella should have been eliminated, based on how it interpreted the solicitation. So we'll reserve the rest of the time for rebuttal and address the cross appeal at that time. All right. Thank you. Mr. Cudley, you have three minutes, sir. Good morning, Your Honors. May it please the Court, Kevin Connolly for Excella Services, AAS. Your Honors have raised a good point. The reality in this situation is the eligibility requirements, the fourth and solicitation, were very specific and very finite. Basically, you had to have a corporate certificate showing that you were- Is there anything in the record that suggests what your client did when it looked at these requirements and whether it checked the database or not to determine that it was eligible? I do not believe there's anything in the record, because we would have been looking, Your Honor, at what the Air Force had done. I mean, certainly that is what occurred. But essentially, though, as you say, finite requirements, very specific requirements, which Excella Services meets. It's clearly a fully registered Danish company. I think one of the things to pay attention to, and I think that's where the end of the analysis is in government, and we agree on that. From the standpoint of requirements were clear. It could not be registered as a subsidiary of a foreign company. Excella Services, AAS, was not. It was a fully registered Danish company. It had the correct banking requirement. In fact, the government had actually made a determination that Excella Services was ineligible. You're right. We would have filed a bid protest because it would have been an unstated evaluation criteria, which is clear based on the fact that the government has argued throughout that there wasn't- that the requirement is fully registered. So I do believe you're absolutely right from that standpoint, Your Honor. There does seem to be some underlying assumption in a lot of this that the government didn't put the right criteria in here, that it really should have explicitly said not just that you can't be registered, but that you can't be a foreign subsidiary. I mean, I know that's all extra record evidence, which shouldn't matter to evaluation of the solicitation, but it does seem to be even some evidence from our State Department suggesting that maybe the solicitation criteria weren't consistent with international agreements. But then the fertile minds of your lawyers would have created a different entity. I don't know. I think if I can address the question, Your Honor, I think the reality is that I think the trial court basically rewrote the solicitation to take out the requirement and to add a requirement for ownership. The GAO, when they had reviewed, had made a determination that neither ownership nor management was a factor in the solicitation. I didn't normally determine whether a company is a foreign subsidiary if you don't look at ownership. Well, I can tell you how I would have done it if I was the government. I would have written a requirement that said foreign subsidiaries are ineligible for award. There wouldn't have been a checkoff. You just wouldn't have been able to submit. There really was a concern in the intent that we see under the circumstances, correct, to whether you're dealing with a foreign subsidiary or not. I think you also have to take a step back. When the court basically went to a stringent evidence, I think where they failed there, besides the Lisberg Declaration, relying on the Lisberg Declaration, the joint statement which they should not have and which I believe even if the court looks at, they will find that the Lisberg Declaration basically says at the end of the day, even if you know percentage of corporate ownership, you can't decide because you have to look at all these other different documents. Until we can do that, you don't know. Therefore, should have done that. That was never part of the consideration. It was a checkoff type of requirement. The joint statement essentially says at the end of the day, we're going to reach a mutual agreement and then we're going to re-solicit and we'll limit competition if any. There's not even a definite requirement from that standpoint. I think they did that. The second thing the court did, I believe, is that- I mean, isn't the problem that the international agreement doesn't specifically say you can't have foreign subsidiaries. It says you should use, to the extent possible, Danish or Greenlandic businesses. But what is a Danish or Greenlandic business? There's any number of tests. You could be a wholly owned foreign subsidiary but still operate exclusively there, employ exclusively Danish-Greenlandic people, pay all the Danish-Greenlandic taxes. Under some definition, that makes you a Danish-Greenlandic business. I think that makes it true. That's what the Air Force was trying to get at. They may have got at it the wrong way. It's true, but I think the court, even when they went back, Your Honor, and they went back and they paid a lot of reference to the Department of State memo, e-mail. But what the court, I don't think, did was pay enough attention to the first e-mail, the first e-mail and the second e-mail. We talked about it in our brief and our reply brief particularly. Well, I mean, the deal is if the Department of State, through diplomacy, decides that this award can't stand because it's upset the Danish and Greenlandic governments, they can take action. The executive branch can take action. They can cancel your contract. They may have to provide you some compensation. But that's what you do through diplomatic channels. You don't rewrite a solicitation to make it accord with your view of an international trade agreement. Your Honor, we're absolutely in agreement with that. I have a minute left, which I'd like to reserve for rebuttal. Okay. Thank you. Mr. Cosgrove, tell me how you divide up the time. Your Honor, the way we're going to do it is Copenhagen, myself, is going to speak for five and reserve two. Counsel for Greenland contractors is going to speak for five and reserve two. And that's Mr. Anstead? Yes, Your Honor. Say that again there. Speak for five, initial, and reserve two. Okay. And Per-Arslaff, counsel, is going to speak for six. Okay. If my math is right, Your Honor, that gives me 20. I got it. You may proceed. Copenhagen's cross-appeal should be sustained and the trial court's decision should be reversed with respect to the issues raised on our cross-appeal. That issue is fairly straightforward. The solicitation required all offerers to maximize the use of Danish and Greenlandic sources in the performance of the contract. Clear, and it also went on and it said that that requirement takes precedence in the performance of this contract. It didn't have a specific percentage. It did not. But the Sentec case and the other cases that have addressed this issue that arise in cases where there were a specific percentage, Sentec case says that subcontracting requirements are material requirements of an RFP, including but not limited to the federal clause that requires 51% subcontracting. The problem is if all it says is maximize, then there's no percentage whatsoever. I mean, they may be able to convince the Air Force that they've maximized if they only employ 20% of Danish Greenlandic residents. Can't they? And I agree, Your Honor, that we might be able to construct a hypothetical where they satisfy that, but that's not the facts in this case. But how do we know that until performance actually occurs? We know it, Your Honor, because if you look at the proposal of RSLOF, all of the- Does it say we're not going to maximize Danish Greenlandic employees? Oh, no, Your Honor. They have to say, all the offerors have to sign a three-line boilerplate certificate that says, yeah, we don't take exception to anything. But then that's not sufficient under SENTEC and the other cases if on its face, a proposal leads an agency to think that a performer cannot and will not comply with that requirement. If you look at RSLOF's proposal, RSLOF's proposal said our American subcontractor is going to assume responsibility for performing every item of this contract, bar none. And then if you go into the guts of the proposal and you say, well, what does responsibility mean? Responsibility means that that American subcontractor is going to self-perform every item in the performance work statements. We can say maybe 20% is enough, maybe 10% is enough, maybe 30% is enough, but the requirement to maximize Danish and Greenlandic sources can't mean that it's okay to use none of them. And that's the situation we're confronted with here. Can sources be, oh, we have entirely Greenland employees? I'm sorry, Your Honor, I didn't hear you. Can sources be simply having entirely a local workforce? No, that's not what they're talking about. They're not talking about workforces. They're talking about subcontractors to purchase supplies and or materials and services. And we're going to do all that through our American subcontractor? With our American subcontractor, period. In Greenland using local supplies? Correct, correct. But why doesn't that qualify? I mean, if they're using an American subcontractor to facilitate it all, but they just rehire the same workforce at this base, which is what almost always happens in these contracts when you get a change in incumbent, and they still continue to use local providers and things like that, they can say, look, we're maximizing it. It may be run out of our American subcontractor, but it's all performed by Greenlandic and Danish workers. Almost all of our sources for materials and things like that come from Danish and Greenlandic sources. And if the proposal had said that, that would have probably been okay. But the proposal doesn't say that, and the Air Force is required, when it gets a proposal... Frankly, I think you have a real problem, because this is still all about performance. We don't know that they're not going to do it. They didn't explicitly say, we refuse to comply with this maximization language. Correct. It doesn't say that. But, again, if you go to look at Centech... In fact, I'm sure they said things in it that suggested they were going to comply. Sure. I mean, if you didn't sign the three-line blanket certification, your proposal would have been kicked. So, of course, they're going to say that. But that's not sufficient. The cases that deal with this, Centech and Allied Resources, say the Air Force has an obligation... Do those cases have maximization language, or do they have specific goals? They have subcontracting requirements. Well, that makes a big difference. I mean, if this contract said, 51% of your work has to come from Danish or Greenlandic subcontractors, employees, and the like, and they didn't comply with that, then that's noncompliance with the solicitation. Correct. But what this court held in Centech was... And if this court... And if we were talking about only that 51% requirement, I would be inclined to agree with you. But that's not what Centech says. Centech says a subcontracting limitation, including the LOS clause, which is the 51% clause in the Federal Acquisition Regulations, is a material RFP term and a condition of a solicitation to which the offeror must agree. Well, there's no... I mean, nobody's suggesting that this isn't a material clause. They're just not suggesting that there's any basis to kick them out because there's no cap or limitation or the like. And the Air Force is required to actually read the proposal when it comes in. And they have to go through it, and they have to say, based on this proposal, is it reasonable for us to believe that they can and will comply with this subcontracting requirement? There is nothing in the proposal, nothing. Except an agreement that they'll comply. Except the three lines. I mean, to the extent that that's a question, that's an administrative record review. It's a substantial evidence. That's enough substantial evidence. Well, I mean, Your Honor, if maximize means none, then I guess maximize can mean none. Tell me, Mr. Bowen. I'm Mr. Cosgrove, Your Honor. I'm sorry. I apologize. That's all right. I've been called worse. Does Denmark restrict ownership of Danish corporations to Danish citizens? I do not know the answer to that question. You should. I do not know the answer to that question, Your Honor. And I see that my time is up, and I'll come back for two minutes. Okay. Thank you. Thank you. Mr. Anstett. Mr. Anstett, you know the answer to my question? I don't, Your Honor. I guess it's beyond the scope of the RFP requirements. While you were diligently looking to see if you were registered as a foreign subsidiary or not, you think you would want to know the ownership. Your Honor, I guess with my client, Greenland Contractors, we've been in business for over 30 years. We've been operating on this base for that time. We didn't have to go back to the register. Well, sure you did. It's a new solicitation. They might have put in a new requirement that kicked you out. But the solicitation on its face said that foreign subsidiaries, subsidiaries of foreign companies, are excluded. We're not a subsidiary. Can you point to me language in the solicitation that says foreign subsidiaries are excluded? It says you cannot be registered as a foreign subsidiary. You're all operating under the assumption that the solicitation excludes foreign subsidiaries. And how did you know you weren't registered as a foreign subsidiary? Wouldn't you want to check? There are a couple of questions there, so let me try to take them in turn. Number one, Section L3 of the RFP. Do you have a page number for me? Sure. It's Joint Appendix 105252. Just give me a second to get there. What's that citation again? It's J105252. And it's L3? L3 at the bottom of that page. Great. This is the clause that we're fighting over, right? Right. And the first sentence that we read in that clause, it says that participation in this acquisition is limited to Danish Greenlandic Enterprises. That doesn't say anything about foreign subsidiaries. Certainly, but it does say that you have to be... I mean, what's a Danish Greenlandic Enterprise? I mean, there could be any number of tests for that. There's a slash there. It's not a hyphen. So the slash means Danish or Greenlandic? Yes. Greenland is a semi-autonomous. I understand. So it could be either, but either one of those is okay. And so you read that, and then you read that in combination with the language that says that the enterprise shall not be registered as a subsidiary of a foreign company. Right. So that's the test it's using for whether you're a Danish or Greenlandic business, whether or not you're registered as a foreign subsidiary. Absolutely. And then we go to the question and answer. One of the question and answer answers that the Air Force gave as part of the RFP, and we read that. This is JA104406, where the question is, what do you mean by, quote, not registered? And the answer from the Air Force is, in the searchable part of the CBR, there is an information point called type of company. Right. We all agree that's wrong. Sure. Everybody gets it. But none of this says, gets to the question of whether the solicitation excluded foreign subsidiaries. But it does say that you, it sets up dichotomy in that answer. It says you're either fully Danish, whatever that means, correct, or you're acting as a foreign subsidiary, not registered as a foreign subsidiary. You're acting as a foreign subsidiary. Can you point to that language? That's the Q&A answer. Right. Where is that? That is, it's on page 104406. 4406. Sorry, say that again. 4406. 4406. So the dichotomy is fully registered as Danish. Yes. What's that mean? Well, it doesn't mean that you're a foreign subsidiary, I guess, is the answer. Why not? Why not? Because that's what they're saying. If you're fully registered as Danish, you're not acting as a foreign subsidiary. So you've just defeated your own argument. Say Coca-Cola, an American company, has worldwide franchisees. I have no idea if that's how Coke operates, but I know that some companies do. And so the franchisees are independent owners and operators under the franchisee agreement. And you have a Danish franchisee of Coke. They're registered as a Danish company. They have a Danish bank account. They have whatever else is it. And they're still a subsidiary of Coke. But why aren't they a fully Danish Greenlandic business if it's owned, operated, and the like? But that's true of every foreign subsidiary. But this RFP specifically called out subsidiaries of foreign companies not being able to… See, this is your problem. You wish the RFP had called it out. All it calls out is you can't be registered as a foreign subsidiary. But I guess we go to the point that the government has already conceded that this RFP has a defect. And really the only question is then is it a patent or latent defect? But to a certain extent, it doesn't matter. Because even if it's a defect, there's no indication that the solicitation excluded foreign subsidiaries. To get there, you have to rewrite the solicitation and add in terms that weren't there. I guess given the government's concession that what they were trying to do, they understood, as they've said, the government's understanding of the solicitation requirement was that you couldn't be a foreign subsidiary. That's what they were checking. That's what the evidence is in the record where they went to the Danish government three times to ask questions about whether or not these companies were registered as foreign subsidiaries. Again, you keep talking about registering. What the government was doing was trying to comply with the first L3 provision. I misspoke, actually. They didn't ask whether they were registered. They asked are they foreign subsidiaries. That's in the language in their question. And I want to take you back to 4406 to make sure you understand what I said and get your response, which was, so there is a way to see if the company is fully registered as Danish or, so you have an either or situation, acting as a foreign subsidiary in Denmark. So if you're fully registered as Danish, says the Air Force, it's de facto you're not. But I guess I understand the or to mean that if you are acting as a foreign subsidiary, then you're not fully registered as Danish. You're not fully Danish. What if they are fully registered as Danish? Then you're okay with them. Well, no, because it says that you can't. I mean, the RFP says that you can't be a subsidiary of a foreign company. You can be. It's not saying that. It says you can't be registered as a foreign subsidiary. I mean, you're running into the same problem that the trial court did, which is to assume the Air Force wanted this requirement and rewriting the solicitation to say that. The Air Force, there's nothing in the record that suggests that. It all talks about registration. It may be that the two governments, state to state, intended that to apply, but the Air Force failed to comply with that international agreement. If so, the governments are going to take care of it. They'll cancel the contract. It will be resolicited, and that will take care of any international problem. But we're talking about the terms of the solicitation. Understood. But I guess I know I don't mean to be impertinent in asking a question, but why would a solicitation have a provision that requires you not to be registered as a subsidiary of a foreign company? Like, registration was the means to an end. I mean, we understand how this was supposed to work. Did you ask that question at the time? I'm sorry? Did you ask that question at the time? No. Well, don't ask it now then. I see that I'm way out of my time, I apologize. Mr. Boland. Thank you, Your Honor. And just to clarify, in the six minutes that I have, I'll address both the cross appeals and the pen appeals. Okay. Mr. Boland, I'll call you Mr. Cosgrove. That's right. Please don't. Briefly, I'd like to address the cross appeals and actually Mr. Cosgrove's comment. I would turn the court's attention to JA106548, and that's a page from Parrar's list proposal which clearly discusses their approach to procuring from Danish sources. 106 what? 106548. And on that page, ours left, I discussed its approach to- This whole page is yellow. I mean, do you understand you're now discussing things you've marked as confidential? That's fine. That's fine. I wasn't aware that it was, but- This is a problem with all of you in this court, and the government needs to pay attention to this too. You all over mark, which is why we're adopting a new rule. How can we discuss something that you've marked, and we don't know if anybody else up here is going to waive this privilege? Is this your information? This is ours left's proposal. This is your proposal. This is our proposal. So why was it marked? I mean, once it becomes accepted, it's part of the contract, isn't it? It's a public document. Ours left was not awarded the contract, so- Oh, sorry. So this is- I'll discuss it. If it's your information, you can discuss it, but realize you're waiving the confidentiality of it. Right. In general terms, and we've addressed in general terms in our brief, simply, we're not going to discuss specifics, but just the fact that ours left identified a process for procuring from Danish sources hundreds of sources in this procurement. We simply wanted to make the point that in the RFP, the RFP only required offers to maximize contract-related purchases and subcontracts, which means that it can be at any tier. Your Honor, on the point that you mentioned earlier about the maximize versus direct, I think that's an important clarification here. The 2009 amendment to the 1991 MOU clarified that there had to be a direct acquisition from Danish sources, which is satisfied by the award to a Danish or Greenlandic enterprise. But after that direct award is made, our understanding and our view is that any requirement after that point is simply to maximize contract-related purchases. So it's perfectly acceptable under the RFP for a U.S. subcontractor to- through hundreds of Danish sources, items and everything. If it's a hundred Danish sources, isn't that maximizing? We certainly think it is. What about five Danish sources or one? It certainly could be, and I think on this point- But you would measure it. Wouldn't you measure it by the value of the service or goods that they're providing to determine whether it's maximizing? You also would measure it based on the circumstances, why you could or could not acquire. It could be cost prohibitive, or there could be a limitation of supplies at the time, and there could be various reasons. But I think the point is, and this is why we believe the cross appeals do not have merit, the word maximize is subjective. You can't make that determination unless they actually conduct an evaluation. And, of course, the language in the RFP not only used that subjective term, but it also allowed for- You're agreeing with what was said previously, I believe, by Judge Rayner, that it's performance-based. It is a performance-based. And the RFPs did not instruct offerors to submit that information with their proposals. It's a post-award documentation and justification process. There is no way on the face of the proposal for the Air Force to determine that ARSLEF could not or would not comply. I'd like to turn back, if I may, to the eligibility issue. I'd like to take another run, if I may, at the Q&A response. This was part of the RFP. And, again, we disagree with the notion that the RFP did not exclude foreign subsidiaries. I think there's important language here in the Q&A response. They first tell the offerors that it's a possibility. They give that assurance. So when the question was asked, the Air Force told the offerors it's a possibility. Then they say, so there is a way to see. That's an important phrase because it tells you that the CVR was simply a mechanism for identifying foreign subsidiaries. Why else would they? A mechanism for determining who's registered as a foreign subsidiary. No, because the mechanism for that is, in Section L3, is simply to submit your CVR certificate. That would have been the end of the story. If this was all about Danish registration, the certificate and bank account would have been sufficient. But the RFP went beyond that. It specifically said in all capital letters, you cannot be registered as a subsidiary of a foreign company. Now, we believe that sentence, although it does include the registered as language, when you combine that with the Q&A response, which is part of the RFP as well from the Air Force, when they say, so there is a way to see if a company is fully registered as Danish on one hand or two, or acting as a foreign subsidiary in Denmark. It's one or the other. And if Excellus is – So you're saying that this really explains the purpose for the registration requirement. Exactly. Not just registration requirement. It was really just to discern at the end whether you're a fully registered Danish corporation, which we've established that you can be a foreign subsidiary and be fully registered as a Danish corporation. In fact, to do business there, you have to be registered as a Danish corporation. But then it goes on and says, or acting as a foreign subsidiary. Right. Right. Is there any suggestion that Excellus is not fully registered as a Danish corporation? They are fully registered as a Danish corporate entity, but they are a foreign subsidiary. Even the answer you're relying on, it's an or. Right. So, yeah, maybe they're a foreign subsidiary, but they may not be acting as a foreign subsidiary. They're registered as a Danish corporation. And that gets to the whole point here of the impossibility. It turns out it was impossible for anyone to register as that type of entity. So the question then, applying canons of contract interpretation, what do you do with the solicitation where this language has the two words registered as, which the Air Force has conceded were, that constitutes the defect. They've already admitted that the word subsidiary. You don't rewrite the solicitation. I mean, if you found this clause was null, you strike the whole clause. But I would respectfully disagree. And I would disagree that the trial court rewrote the solicitation. The trial court was careful to use the word recast or excising the words. And I think that's supported in case law where. I mean, this case, isn't this case just like what the same trial court did in Alabama Aircraft, where it thought that the agency was not evaluating the solicitation and the proposals properly because other things should be considered but weren't and imposed them. And we reversed that judge. It's the same thing here. The solicitation doesn't exclude foreign subsidiaries. It excludes companies registered at foreign subsidiaries. The trial judge thought that should have said excludes foreign subsidiaries. And so he excised the words registered as to get to the meaning he wanted. I respectfully disagree. I think Alabama Aircraft, in that case, the trial judge went too far because the trial judge thought that it would be. In the trial judge's wisdom, that case involved the price evaluation of aging aircraft. And the trial judge thought in that case it's unreasonable not to take that into consideration, the price evaluation. So he added that into the RFP. And the Federal Circuit reversed that. The trial judge did not add any language. He did. He added an exclusion of foreign subsidiaries when the only exclusion was registered as foreign subsidiaries. Those are two different things, right? You agree? I would agree, but he did not add language. So in other words, the concept of a foreign subsidiary. It doesn't matter if he added language. If the result of his action is to add a solicitation requirement that wasn't in it by excision or addition, it's still adding a solicitation requirement. I disagree that anything was added. I think that the trial court had to construe the solicitation to give meaning, as much meaning to as many of the terms as possible. And I think when you look at that phrase, the subject matter of that phrase is subsidiary or foreign company registered as. And, of course, you look at the Q&A and you look at all the actions of the Air Force before and after. It's evident that everyone understood what this means. And I think the fact that the Danish government did not pick this up indicates that it's sort of a normal reading of that. You're excluding foreign subsidiaries. Okay. I think we've heard this argument already. So you're out of time also. Okay. Thank you, Your Honor. Yes. Mr. Reale. In fact, he used up all Mr. Cosgrove's time. Your Honors, unless the court has any further questions, we don't have anything else. We just respectfully request that the court reverse the judgments in favor of the plaintiffs and affirm the issue in the cross appeals. Okay. No questions? All right. Thank you very much. Mr. Conley. Briefly, Your Honors, a number of you asked the question as to whether or not Denmark restricts ownership of corporations. It absolutely does not. They have a very open system. They encourage people to come in and form corporations there. We talk a little about it in our briefs at page 45 of our opening brief, page 41 of our reply brief. The only other point I'd like to make quickly. Is your client fully registered as a Danish corporation? Yes, it is. What does that mean, fully registered? You're incorporated as a Danish corporation, correct? It is. It's an ASA. Do you have to go note that registration somewhere? Let's say you were a foreign corporation and you're incorporated in Denmark. Does the law require you to go note that somewhere, to go register as a foreign? You're registered in the business registry, the CVR, which is what the Air Force looked at. Accel Services is registered. We know that the CVR doesn't have that field for you to register as a foreign. Is there anything else other than a CVR where you must register as a foreign corporation? If you are a foreign company providing services and you do not go through the process of becoming a Danish company, then you register in the CVR system as a branch of a foreign organization. That's not what Accel Services is. Accel Services is a fully registered Danish company. It's an AS. Same thing as Copenhagen and the same thing as Paris. The last thing I would just say, with respect to the or, that seems to take out any patent and lead to an ambiguity argument. That wording right there, even looking at the solicitation, you would have to note you could be both. It's not an and. You have to raise it at that point. Thank you, Your Honour. Thank you. Mr. Castro. I think the point that's being lost here today is that it's impossible to register as a foreign subsidiary. Therefore, that restriction is illusory. It doesn't exist. It can't happen. No company in the history of the world, in terms of Denmark. I don't think that point is lost on any of us. We've been talking about it for the last half hour. Correct. But now we have to look at it and we have to say, okay, so it's impossible to register. What was the Air Force trying to achieve by putting this in here? What were they trying to do? Were they interested in actually trying to address ownership or were they interested in trying to address just this illusory thing that can't happen? If you go to pages in our brief, I would call the court's attention to pages 21 through 24 of our brief. We set forth everything that the Air Force had in its possession as of May that would have completely and conclusively ended the registration issue. They had complete authority to make the decision. They had checked all the records. It was all done. Fine. That should have been the end of the issue, but it wasn't. They went on and on and on trying to find out if these companies were in fact subsidiaries of foreign companies, not just whether they were registered as, because that decision had been made in May. That's proof, I would submit, that when the Air Force had this mistaken solicitation, what they really meant was to exclude foreign subsidiaries, actual foreign subsidiaries. Okay. You're out of time, sir. I am? Yes. Thank you, Your Honor. Thank you. Mr. Anstett. Thank you, Your Honor. If I may go beyond the question of foreign subsidiary and just remind the court that the Air Force has conceded that there was a defect in the RFP. I mean, you know you're up here on your cross appeal. You're not up here on the government's appeal. I apologize. On our cross appeal, which I apologize I was not able to get to in my last argument, I would answer the questions from the court about, I understand the question about maximizing and is that an elastic test or is it something that's finite? And as Mr. Cosgrove said, the point is here the RFP, the proposals of all three offerors, but all three offerors as we detailed in our brief, specifically said the very first subcontract that we're going to use to perform this work is with a U.S. company. And all the questions that we've raised today about what does that mean and how would the Air Force know, those are questions for the Air Force to have asked in their evaluation. The Air Force here has conceded they never looked at it. They didn't worry about this problem at all. And that is the evaluation error that was committed here on the subcontracting limitation requirement. Finally, I just remind the court that regardless of what happens in the court here, if the court were to reverse on the eligibility question and affirm on the subcontracting issue, Greenland Contractors has two other issues in our protest that Judge Leto declined to reach because of his disposition of these issues, the other issues. So we're going back to Judge Leto one way or another in this case. Thank you very much. Thank you. That concludes today's arguments. This court now stands on recess. All rise. The Honorable Court is adjourned until tomorrow morning at 10 o'clock.